The Honorable David G. Estudillo

1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR21-5334-DGE |
| Plaintiff, | |
| v. | UNITED STATES' SENTENCING MEMORANDUM |
| MIKEY DIAMOND STARRETT a/k/a MICHAEL JASON LAYES, | |
| Defendant. | |

**INTRODUCTION**

In a monthslong campaign of violence against Jehovah's Witnesses in western Washington, Mikey Diamond Starrett set fire to two Kingdom Halls, shot up another, and then burned one down completely. Starrett carried out these attacks—as he admits in his plea agreement—because of the properties' religious character. He has now pleaded guilty to four counts of damage to religious property and one count of using a firearm during and in relation to a crime of violence. The firearm count alone carries a mandatory minimum of 84 months in prison, which must run consecutive to the sentences on the other counts. Under the Rule 11(c)(1)(B) plea agreement, the United States agreed to recommend a prison sentence of no more than 171 months—a sentence within the Guidelines range calculated by the parties and within the higher range calculated by U.S. Probation.

U.S. Sentencing Memo – 1
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The Court should impose that 171-month sentence, plus three years of supervised release, a total of $714,608.70 in restitution to Starrett's victims, and forfeiture as specified in the plea agreement. The United States respectfully submits that this sentence is sufficient but not greater than necessary to hold Starrett accountable for his four brazen attacks, protect the community, and achieve the statutory sentencing goals.

## BACKGROUND

### A.  Starrett's four attacks on Jehovah's Witness houses of worship[1]

Between March and July 2018, Starrett executed an escalating campaign of violence against Jehovah's Witness Kingdom Halls in western Washington. In just five months, Starrett attacked a Kingdom Hall—the unadorned house of worship where Jehovah's Witnesses peacefully gather and pray—four separate times. As detailed below, in March 2018, Starrett set fire to the Kingdom Halls of Tumwater and Olympia, Washington, damaging the exterior walls of each property. Two months later, in May 2018, Starrett armed himself with a rifle and fired more than a dozen rounds into the Kingdom Hall of Yelm, Washington, puncturing its walls and shattering a window. Finally, in July 2018, Starrett returned to the Olympia Kingdom Hall and set a fire that completely destroyed it.

Starrett's crimes were devastating. He disrupted the regular services of multiple Kingdom Halls. He displaced hundreds of members from their houses of worship. He caused hundreds of thousands of dollars in collective damage. He risked the wellbeing of witnesses and first responders. And the congregations of the victimized Kingdom Halls painstakingly shouldered the physical and financial burden to repair and rebuild these structures.[2] Yet the damage or destruction of these properties was collateral to the real harm

---

[1] This section supplements the statement of facts that Starrett signed and stipulated to as part of his plea agreement (Dkt. 145) and includes information and findings obtained from local police and fire departments in Thurston County, Washington, the FBI, and ATF.

[2] Members independently own and operate Kingdom Halls under the auspices of Watchtower Bible and Tract Society of New York, Inc. (WTNY), the national corporate entity of the Jehovah's Witnesses. As described below, members personally repaired their damaged Kingdom Halls and paid for the associated costs, except that WTNY financed the rebuilding of the Olympia Kingdom Hall after Starrett destroyed it on July 3, 2018.

U.S. Sentencing Memo – 2
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that Starrett caused. In just a few short months, Starrett struck fear into countless Jehovah's Witnesses across the state and caused permanent and irreparable harm to this peaceful worship community.

**1.  Starrett sets fire to the Tumwater and Olympia Kingdom Halls (Mar. 2018)**

Starrett's series of attacks began in the early morning hours of March 19, 2018, when he set fire to the Tumwater and Olympia Kingdom Halls. Around 3:30 a.m., Starrett left his home in East Olympia, Washington and traveled to the area of the Tumwater Kingdom Hall. Starrett wore dark-colored clothing and gloves that concealed his identity and carried a mixture of gasoline and diesel onto the property. Starrett walked to the back of the Kingdom Hall, poured the mixture onto an exterior wall, and set it on fire. The fire burned up and through the wall, eventually reducing to a plume of smoke.

Rather than return home, Starrett traveled several miles east to set fire to the Olympia Kingdom Hall. As captured on surveillance video, he carried two plastic jugs filled with a mixture of gasoline and diesel to the back of the building, poured the mixture on an exterior wall, and set it on fire. The Kingdom Hall burst into flames. *See* Fig. 1. The fire burned up and through the wall until the flames receded to the walkway. Starrett finally returned home while the fires at each Kingdom Hall continued to burn or smoke.



*Fig. 1: Surveillance video of Starrett setting fire to the Olympia Kingdom Hall on March 19, 2018.*

Witnesses discovered the fires at each Kingdom Hall later that morning and called 911. Shortly after 8:20 a.m., a witness drove by the Olympia Kingdom Hall and saw that the siding of the structure was on fire. Less than thirty minutes later, several Jehovah's Witnesses arrived to the Tumwater Kingdom Hall and saw smoke billowing from the

U.S. Sentencing Memo – 3
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

building. Some members collected a garden hose attached to the Kingdom Hall and used it to try to extinguish the fire, while others called 911 and waited for help to arrive. Local fire department personnel responded to both Kingdom Halls and extinguished the fires. Investigators then surveyed the damage to the Kingdom Halls and discovered that the walls abutting their auditoriums, where members routinely gathered to worship, had each sustained external and internal damage. *See* Fig. 2.

 

*Fig 2: Damage to the walls of the Tumwater Kingdom Hall (above) and Olympia Kingdom Hall (below) resulting from Starrett's March 19, 2018 arsons.*

 

After the fires, congregants of the Tumwater and Olympia Kingdom Halls repaired them. The fire Starrett set at the Tumwater Kingdom Hall caused damage in the amount of $4,921.73, which includes $3,039.31 to repair the structure and $1,882.42 to install a security system. The congregants of the Olympia Kingdom Hall were unable to account

U.S. Sentencing Memo – 4
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

for the costs resulting from the March 2018 fire, as those records were destroyed in the July 2018 fire that burned the Kingdom Hall down completely.

### 2. Starrett shoots up the Yelm Kingdom Hall (May 2018)

Less than two months later, Starrett armed himself with a rifle and fired multiple rounds into the Yelm Kingdom Hall. At about 2:45 a.m., Starrett arrived to curtilage of the property carrying a Colt Model M4 Carbine 5.56mm rifle that he had purchased just a few months earlier. Starrett raised the weapon and fired 16 rounds into the Kingdom Hall, spraying bullets indiscriminately across the property before fleeing the scene. The bullets punctured exterior walls, broke through a window, and cracked the pavement of the parking lot. *See* Fig. 3. Several bullets penetrated inside Kingdom Hall and ricocheted into its auditorium, conference room, office, restroom, and utility closet.

Nearby residents, including a member of the Kingdom Hall, heard the sound of gunfire ring out across the area. Local law enforcement responded to the property later that morning following several calls to 911 and surveyed the damage to the property.



*Fig. 3: Damage to an interior window of the Yelm Kingdom Hall caused by Starrett's shooting spree.*

After the shooting, congregants of the Yelm Kingdom Hall repaired the damage to the property. Starrett's shooting at the Yelm Kingdom Hall caused damage in the amount of $1,749.20, which includes $399.23 to install a new window; and (2) $1,349.97 for a new security system.

U.S. Sentencing Memo – 5
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 3.   Starrett burns the Olympia Kingdom Hall to the ground (July 2018)

Starrett's arson- and shooting-spree ended less than two months later when he returned to the Olympia Kingdom Hall and set a fire that completely destroyed it. At approximately 1:23 a.m., Starrett arrived to the Kingdom Hall wearing dark-colored clothing, a face mask, and gloves to conceal his identity. This time, Starrett carried a box of fire logs and a bottle of lighter fluid. As captured on surveillance camera video, Starrett walked to the back corner of the Kingdom Hall and placed the fire logs along an exterior wall. He then doused the box and the wall with a bottle of lighter fluid, and set it on fire. The Kingdom Hall burst into flames; Starrett, in turn, ran away and off the property. *See* Fig. 4.



*Fig. 4: Surveillance video Starrett setting fire to the Olympia Kingdom Hall on July 3, 2018 fire.*

The fire penetrated the wall and quickly spread across the structure; soon, the Kingdom Hall was engulfed in flames. The fire continued to rage for hours. Shortly after 3:00 a.m., a passerby saw the fire and called 911. Olympia Fire Department personnel quickly responded to the Kingdom Hall and extinguished the blaze, but could not save the property. The fire had already consumed most of the Kingdom Hall and the roof had collapsed. Finally, Starrett achieved what he set out to accomplish—the Kingdom Hall was destroyed. *See* Fig. 5.

U.S. Sentencing Memo – 6
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



*Fig. 5: The destruction of the Olympia Kingdom Hall on July 3, 2018.*

Over the next four years, congregants of the Olympia Kingdom Hall painstakingly rebuilt the structure with the support of volunteer labor from the greater Jehovah's Witness community and with the financial support of Watchtower Bible and Tract Society of New York, Inc. (WTNY). As a result of this fire that Starrett set at the Olympia Kingdom Hall, it sustained damage in the amount of $707,937.73, which includes (1) $86,653.17 for the administrative planning, tools, equipment, and construction vehicles necessary to rebuild the structure; (2) $144,949.15 for water utilities, electrical distribution systems, and temporary housing for volunteers laborers; (3) $467,385.87 for construction materials, including new walls, doors, flooring, and roof, as well as new HVAC, water, fire suppression, audio-visual, and security systems; and (4) $8,949.54 for property taxes paid while the property was no longer tax-exempt as a house of worship—that is, the period between the destruction of the Kingdom Hall and its re-opening in January 2023.

U.S. Sentencing Memo – 7
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 4. Investigators arrest Starrett

In 2018, federal authorities opened a hate crime investigation into these four attacks on Jehovah's Witness Kingdom Halls. During its investigation, federal investigators identified Starrett as a suspect and executed a search warrant of his residence and online accounts. During the searches, federal agents discovered significant evidence linking Starrett to the attacks, including cell phone location data, internet search history, weapons and ammunition, financial records, and clothing.

Additionally, investigators uncovered information demonstrating that Starrett intentionally selected the Kingdom Halls because of his animus toward Jehovah's Witnesses. As an initial matter, Starrett's choice to exclusively attack Kingdom Halls—and not any other structures or houses of worship in western Washington—is on its own evidence of his animus toward Jehovah's Witnesses. Starrett's internet history underscored his intent to specifically victimize Kingdom Halls—he viewed all three victimized Kingdom Halls multiple times on Google Maps, in addition to at least nine other Kingdom Halls across western Washington. Starrett's internet history also revealed the depth of his hostility toward Jehovah's Witnesses and Christianity more broadly. For example, Starrett conducted extensive searches for relevant information in the time period before and after the attacks, including the phrases: "Jehovah Witness refuse military service;" "Jehovah Witness leadership;" "Harry Holt - JW elder sexually assaulted 8 girls over 4 decades;" "False bible teachings;" "Christianity Debunked Using Science and History;" "Why Christianity is fake;" Exposing false church doctrine and popular false Christian doctrine video;" "10 things I hate about Christianity video;" "Disproving Christianity;" and "How to Destroy Christianity with One Easy Step video."

Investigation revealed that Starrett did not contain his views about Jehovah's Witnesses to the privacy of his internet browser. To the contrary, interviews of Starrett's friends and families confirmed that he expressed a strong and yearslong bias against Jehovah's Witnesses. He told friends and family that he disliked Jehovah's Witnesses and

U.S. Sentencing Memo – 8
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

believed the spirits of deceased Jehovah's Witnesses were haunting him. He described Jehovah's Witnesses as "sleazy" and as "gangster[s]" who were uninterested in serving the community. He said Jehovah's Witnesses were trying to take over the world and wanted to do something about it. He said that he wished they were all dead.

Finally, investigators uncovered evidence of the extensive, calculated steps Starrett took in order to evade law enforcement. For example, Starrett deleted his cell phone location data, wiped an electronic device, and changed his phone number and name. Further, when confronted by law enforcement regarding his responsibility for these attacks, Starrett lied. Starrett's efforts to escape accountability and cover up the attacks he committed shows his disrespect for the law and repeated attempts to escape accountability.

On September 8, 2021, Starrett was arrested following the discovery of this and other evidence connecting him to the attacks. Starrett was first charged with possessing an unregistered firearm seized from his home (unrelated to his crimes of conviction), but was later charged with federal hate crimes and other felonies stemming from his attacks on the Jehovah's Witness Kingdom Halls.

**B.    Starrett pleads guilty to four hate crimes and a gun offense**

In December 2022, a federal grand jury returned a nine-count second superseding indictment against Starrett. Dkt. 100. In May 2024, Starrett pleaded guilty under a Rule 11(c)(1)(B) plea agreement to four counts of Damage to Religious Property under 18 U.S.C. § 247(a)(1) and (d)(3), as charged in Counts 1, 3, 5, and 7, for intentionally damaging or destroying the Jehovah's Witness Kingdom Halls of Tumwater, Olympia, and Yelm because of their religious character. Dkt. 145 (Plea Agreement). Starrett also pleaded guilty to Using a Firearm During and in Relation to a Crime of Violence under 18 U.S.C. § 924(c)(1)(A) and (c)(1)(A)(ii), a lesser-included offense of Count 6, in connection with his attack on the Yelm Kingdom Hall. *Id.*

As part of that plea agreement, the government agreed (subject to the limitations set forth in the agreement) to dismiss the remaining counts and to recommend a total prison

U.S. Sentencing Memo – 9
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

sentence of no more than 171 months. Plea Agreement ¶¶ 11, 15. Starrett signed a statement of facts, in which he admitted facts supporting his guilty plea, including that: he set fire to the Tumwater and Olympia Kingdom Halls on March 19, 2018; used a rifle to shoot multiple rounds into the Yelm Kingdom Hall on May 15, 2018; and set fire to the Olympia Kingdom Hall on July 3, 2018. *Id.* ¶ 8. Starrett further admitted that he damaged or destroyed the victimized Kingdom Halls on these occasions because of the religious character of the properties. *Id*.

Further, Starrett waived (among other things) any right to appeal his sentence "provided the Court imposes a custodial sentence that is within or below the Sentencing Guidelines range (or the statutory mandatory minimum, if greater than the Guidelines range) as determined by the Court at the time of sentencing." *Id*. ¶ 17. Starrett also agreed that in "exchange for the promises by the United States contained in" the plea agreement, he will pay any restitution ordered by the Court. *Id*. ¶ 12.

## SENTENCING GUIDELINES

All sentencing proceedings must begin with a correct calculation of the applicable Guidelines—the starting point and initial benchmark, which must be kept in mind throughout the sentencing process. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). A Guidelines sentence "will usually be reasonable." *Rita v. United States*, 551 U.S. 338, 351 (2007).

In determining the applicable Guidelines range, the district court must, *inter alia*, determine the application of victim-related adjustments. Section 3A1.1(a) applies a three-level upward adjustment when "the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived . . . religion . . . of any person." USSG § 3A1.1(a). The Ninth Circuit recently interpreted this Guidelines enhancement to require a finding that the defendant was motivated by hate or animus. *United States v.*

U.S. Sentencing Memo – 10
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Patterson*, __ F.4th __, 2024 WL 4352616, at \*1–\*5 (9th Cir. Oct. 1, 2024).[3] Starrett agrees that this enhancement applies to him. Plea Agreement ¶ 9.

The PSR concluded that Starrett's combined Guidelines range is 162 to 181 months. In reaching that conclusion, the PSR calculated that the Guidelines range on Counts 1, 3, 5, and 7 is 78 to 97 months, based on a total offense level of 28 and a criminal history category of I, to run consecutive to the mandatory term of imprisonment of 84 months on Count 6. *See* PSR ¶¶ 26–63, 106; PSR Objections. The PSR's Guidelines calculation also incorporated a 3-level increase because Starrett intentionally selected the properties in Counts 1, 3, 5, and 7 because of the actual or perceived religion of the individuals attending religious services there (USSG § 3A1.1(a)), a 4-level increase due to the grouping of the counts to which Starrett pleaded guilty (USSG § 3D1.1), and a 3-level decrease for acceptance of responsibility (USSG § 3E1.1).

In the plea agreement, the parties calculated Starrett's combined Guidelines range as 154 to 171 months. The parties' Guidelines calculation is identical to the PSR, except that the parties applied only a 3-level increase due to grouping of the counts to which Starrett pleaded guilty (USSG § 3D1.1). This alternative calculation stemmed from the parties' cross-reference to USSG § 2B1.1 ("Property Damage or Destruction"), rather than § 2K1.4 ("Arson; Property Damage by Use of Explosives"), for Count 5 since that offense concerns damage to religious property through use of a dangerous weapon rather than fire. *See* PSR Objections. The government believes that the appropriate cross reference is USSG

---

[3] The government respectfully submits that the requirement that the defendant have intentionally selected property "because of" the actual or perceived religion of any person requires only that the government prove that the property would not have been selected for this offense "but for" the religion of any person. *See Burrage v. United States*, 571 U.S. 204, 212 (2014); *United States v. Miller*, 767 F.3d 585, 591 (6th Cir. 2014) (assessing identical language in 18 U.S.C. § 249 to require proof that "actual or perceived religion was a but-for reason the defendant decided to act"); *see also Bostock v. Clayton Cty*, 590 U.S. 644, 656 (2020) (holding that the phrase "because of" in Title VII requires only that a "particular outcome would not have happened 'but for'" the protected characteristic). The text of § 3A1.1(a) includes no additional requirement relating to a defendant's motivation for that selection. *See In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 154 (2d Cir. 2008) (motivation is "utterly irrelevant to the applicability of the hate crime enhancement"). Regardless, the parties agree that this enhancement applies to Starrett. Plea Agreement ¶ 9.

U.S. Sentencing Memo – 11
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

§ 2B1.1. But under either Guidelines calculation—the parties' 154-to-171-month range or Probation's 162-to-181-month range—the government's 171-month recommendation remains the same.

## UNITED STATES' RECOMMENDATION AND JUSTIFICATION

The Court should sentence Starrett to 87 months' incarceration concurrent on Counts 1, 3, 5, and 7, to run consecutively to the mandatory-minimum 84-month sentence on Count 6, for a total prison term of 171 months. The Court should also impose a three-year term of supervised release and restitution to Starrett's victims. This sentence is sufficient but not greater than necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a).

**A.    The nature and circumstances of Starrett's crimes support the recommended sentence**

The government's recommended within-Guidelines sentence accurately reflects the gravity of Starrett's crimes: four brazen and unprovoked attacks on Jehovah's Witness Kingdom Halls in western Washington. Over a period of just five months, Starrett committed an escalating campaign of violence that damaged or destroyed multiple Kingdom Halls, caused hundreds of thousands of dollars in collective damage, and terrorized the peaceful worship of Jehovah's Witnesses across the region.

Starrett's conduct was serious and violent: He set fire to the Tumwater and Olympia Kingdom Halls; he used a rifle to fire more than a dozen rounds into the Yelm Kingdom Hall; and then he returned to the Olympia Kingdom Hall to set it on fire again. Starrett's violent spree culminated in this fourth and final attack, which destroyed the Olympia Kingdom Hall in its entirety. Starrett's conduct was premeditated and calculated. He plotted in a calm and deliberate manner over several months to destroy multiple Kingdom Halls in three cities across western Washington. He researched multiple Kingdom Halls on the internet and repeatedly viewed the locations of each victimized Kingdom Hall on Google Maps. He purchased supplies and weaponry from nearby stores. He practiced the

U.S. Sentencing Memo – 12
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

route from his home to the Tumwater and Olympia Kingdom Halls. He displayed his knowledge, experience, and skills by using multiple means to attack the Kingdom Halls. Indeed, Starrett's resolve to decimate these houses of worship was unrelenting: He changed tactics and tools to achieve the total destruction of a Kingdom Hall, including the use of a dangerous weapon and two distinct methods by which to commit arson. Starrett finally accomplished what he set out to achieve when he completely destroyed the Olympia Kingdom Hall.

Starrett's attacks and the complex planning that preceded it did not result from a momentary lapse of judgment or an impulsive act. Starrett had repeated opportunities to consider his actions and see their effect; instead, he not only continued but escalated his attacks in an effort to destroy the Kingdom Halls. His repeated efforts to burn down or fire into these Kingdom Halls jeopardized the wellbeing of witnesses or first responders. Moreover, Starrett's actions cost the congregations and WTNY hundreds of thousands of dollars in collective damage, and caused the extended displacement of hundreds of Jehovah's Witnesses from their houses of worship.

The nature and circumstances of these crimes cannot, however, be measured solely by the extent of the property damage or the absence of physical injury. Hate crimes strike at the very soul of affected communities. In passing the Church Arson Prevention Act, Congress described how religious hate crimes send a message of fear and intimidation to the targeted community. *See* Joint Statement of Floor Managers Regarding H.R. 3525, The Church Arson Prevention Act of 1996, 142 CONG. REC. S7908-04 at *S7909 (1996) (noting that "[i]ncidents such as spray painting swastikas on synagogues, or firing gunshots through church windows are serious hate crimes that are intended to intimidate a community and interfere with the freedom of religious expression."). Thus, the damage or destruction on a house of worship is a violent attack not merely on one structure or congregation, but on its larger community.

U.S. Sentencing Memo – 13
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Here, the sentence imposed by this Court should reflect not only the extensive property damage he caused to the targeted Kingdom Halls, but also should account for the damage to the Jehovah's Witness community. Congregants of the victimized Kingdom Halls were displaced from their houses of worship and feared another attack upon their return. His attacks also terrified Jehovah's Witnesses at other Kingdom Halls across the region. Leaders of several Kingdom Halls installed exterior surveillance cameras on the properties and began to require those who entered during services to be admitted through locked doors. *See* PSR ¶ 23. Volunteers were also enlisted to assist with the physical security of the properties, conducting constant surveillance inside the Kingdom Halls and regularly patrolling the area to protect those worshipping inside. *Id*. The victims had to take these unprecedented measures despite the tenets of Jehovah's Witnesses, whose Kingdom Halls are traditionally open to the public to allow unrestricted access for worship. Ultimately, Starrett's attacks irrevocably destroyed the sense of safety and peace that a house of worship is supposed to provide, and caused severe, permanent harm to the Jehovah's Witness community in Washington. These were not crimes against buildings, but a series of attacks against a community and a faith. That community has made abundantly clear in its Victim Impact Statement (attached to the PSR) just how shocked and profoundly devastated they were by Starrett's attacks.

Those attacks were premeditated and committed by a man who took elaborate measures to conceal his identity from law enforcement. Starrett wore dark clothing that masked his identity. He traveled to the targeted Kingdom Halls in the middle of the night. He purchased supplies to damage or destroy the Kingdom Halls with cash. He disposed of clothing captured on surveillance video and released to the public. He changed his name and attempted to delete his location data. From the time of the attacks until his arrest more than three years later, Starrett attempted to evade law enforcement. His efforts to escape accountability delayed his apprehension and deprived the affected congregations and the greater Jehovah's Witness community of the peace that swift convictions provide.

U.S. Sentencing Memo – 14
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Ultimately, Starrett's violence against these Kingdom Halls requires punishment that reflects its seriousness. Starrett's conduct was premeditated and brazen. He committed not just one attack, but four. The damage or destruction he caused terrorized the Jehovah's Witness community and threatened our nation's promise of religious liberty. It is precisely the kind of grave conduct that Congress sought to address when it passed the Church Arson Prevention Act and precisely the kind of conduct that justifies a significant prison sentence.

**B.   The recommended sentence promotes respect for the law, provides for deterrence and just punishment, and protects the public**

Other section 3553(a) factors likewise support the within-Guidelines 171-month sentence recommended by the government. A significant sentence is necessary to promote respect for the law, provide specific and general deterrence, achieve just punishment, and protect the public from Starrett's further crimes. 18 U.S.C. §§ 3553(a)(2)(A), (B), and (C). Starrett's attacks damaged or destroyed multiple Kingdom Halls, risked the welfare of witnesses and first responders, disrupted the activities of the Kingdom Halls and their congregants, and terrorized the greater Jehovah's Witness community.

The recommended sentence will send a clear message that those who attack houses of worship will be prosecuted and held fully accountable for their criminal conduct that strikes at core American values. Indeed, the message that the Court sends through the sentence it imposes should be clear and unequivocal: Using violence to terrorize religious worshippers will not be tolerated, and those who damage or destroy religious property will face meaningful consequences. A downward variance or statutory-minimum sentence to a single day for each hate crime count—as Probation proposes—would suggest that violent attacks on religious institutions are not deserving of the sanction that Congress and the Sentencing Commission have deemed just punishment based on the federal courts' collective sentencing expertise accumulated over the decades. By contrast, the government's recommended sentence would announce that defendants that target houses of worship will be held to account in the Western District of Washington.

U.S. Sentencing Memo – 15
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The recommended sentence would also protect the public from Starrett's further crimes. Over months, Starrett committed several violent, premeditated attacks using fire or a dangerous weapon. His attacks were brazen and show that he believed he could engage in extensive criminal conduct without consequence. Starrett's disregard for the safety of the Kingdom Halls, its congregants, first responders, and the surrounding area, which is vulnerable to devastating wildfires, underscores the danger that he poses to the public. Moreover, Starrett's crimes traumatized not only the affected congregations, but the broader Jehovah's Witness community by instilling fear that they too could be targeted because of their religious beliefs. This community is at less risk of being targeted and victimized through violence when those, like Starrett, who choose to perpetuate violent crimes are incarcerated. Thus, the recommended sentence is also necessary to protect the community from Starrett for the term of his incarceration.

## C.   Starrett's history and characteristics support the recommended sentence

The government's sentencing recommendation also fully accounts for Starrett's history and characteristics. 18 U.S.C. § 3553(a)(1). Starrett has no recent criminal history before his five instant felony convictions. He is also well educated and has a long history of employment, including owning and operating multiple businesses as a wetland scientist. PSR ¶¶ 64–66, 97–100.

These mitigating circumstances, however, do not vitiate Starrett's violent conduct or justify a downward variance. Starrett did not commit a single, momentary lapse in judgment in an otherwise law-abiding life. He executed a monthslong period of violence that terrorized a peaceful worship community across the state. Over five months, he burned down or fired into a Kingdom Hall four times. He endangered the wellbeing of witnesses and first responders, caused hundreds of thousands of dollars in collective damage, and struck fear into Jehovah's Witnesses across the state. He then took calculated, complex steps to cover up his responsibility for these attacks and escape accountability until his

U.S. Sentencing Memo – 16
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

arrest more than three years later.[4] Consequently, Starrett's lack of criminal history is undermined by the five serious crimes he committed in just as many months. Similarly, Starrett's advanced education and entrepreneurship only underscore that he understood exactly the nature of his crimes and the potential repercussions. Yet he chose to commit violent and brazen acts against a peaceful worship community anyway.

Finally, Starrett, who is 52, reports experiencing a difficult and traumatic childhood. PSR ¶¶ 72–78, 90, 92–95. Based only on Starrett's representations, Probation scores him as an 8 on the 0-to-10 Adverse Childhood Experiences scale and relies exclusively on Starrett's childhood to recommend that the Court impose the minimum sentence available—including just a single day, to run concurrently, on all four hate crimes. PSR ¶¶ 71, 94, 122 (stating that Starrett's "Personal and Family Data" is "unverified," and finding that Starrett's "difficult and traumatic childhood and lack of parental guidance" were the only mitigating factors that may justify a downward variance from the Guidelines range). But troubled childhoods are hardly uncommon among criminal defendants,[5] and the circumstances of Starrett's difficult childhood do not come close to excusing the conduct he committed in middle age or to justifying a downward variance.

Nonetheless, the government's sentencing recommendation fully accounts for this evidence while balanced against and viewed in the context of Starrett's unprovoked

---

[4] Some evidence suggests that Starrett may have experienced substance abuse and mental health issues when he committed these offenses. For example, he admitted to heavy alcohol use during the time of the attacks. PSR ¶ 95 (Starrett "was drug-free at the time of the offense" but "was drinking heavily"). Yet Starrett appears to deny any substance abuse or mental health issues at the time of the offenses or now. PSR ¶ 90 ("Mr. Starrett is in good mental health . . . and describes himself as 'a happy guy.'"); *id.* ¶ 91 ("Mr. Starrett has never experienced suicidal ideation or problematic gambling."); *id.* ¶ 95 ("He was drug-free at the time of the offense"); *id.* ¶ 96 ("Mr. Starrett has never participated in substance use disorder treatment and asserts he has quit drinking and vows to never return to it.").

[5] *See, e.g.*, *United States v. Collier*, 506 F. App'x 459, 464 (6th Cir. 2012) ("Unfortunately, troubled childhoods plague many criminal defendants."); James A. Reavis et al., *Adverse Childhood Experiences and Adult Criminality: How Long Must We Live before We Possess Our Own Lives?*, The Permanente Journal (Spring 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3662280.

U.S. Sentencing Memo – 17
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

campaign to damage or destroy multiple houses of worship.[6] As chronicled below, a 171-month sentence is consistent with or lower than several sentences imposed on similarly situated serial church arsonists. A downward variance, by contrast, would give excessive weight to Starrett's background, privileging his background over the fears, anxieties, and anguish experienced by the victims of his violent crimes.

Such a sentence would also fail to address the severe harm of Starrett's actions and contravene Sentencing Commission guidance. *See* USSG § 5H, Introductory Commentary ("Although the court must consider 'the history and characteristics of the defendant' among other factors, . . . in order to avoid unwarranted sentencing disparities the court should not give them excessive weight. Generally, the most appropriate use of specific offender characteristics is to consider them not as a reason for a sentence outside the applicable guideline range but for other reasons, such as in determining the sentence within the applicable guideline range . . . ." (citing precedent including *Gall v. United States*, 552 U.S. 38, 49 (2007)). In sum, the government's recommended sentence gives proper weight to Starrett's history and characteristics, balanced against other relevant section 3553(a) factors.

## D.  The recommended sentence avoids unwarranted sentencing disparities

The 171-month sentence recommended by the government avoids creating unwarranted sentencing disparities "among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress's main goal with section 3553(a)(6) was to promote nationwide consistency in sentencing, *United States v. Jaycox*, 962 F.3d 1066, 1071 (9th Cir. 2020)—that is, to avoid "unjustified difference" across judges or districts, *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007). The Guidelines, which are themselves an anti-disparity formula, are the best tool for

---

[6] In no event should the government's discussion of aggravating factors be construed as recommending a prison sentence greater than 171 months. The government highlights these points only to explain why the Court should not impose a lower sentence, such as the below-Guidelines sentence of 84 months and one day that Probation recommends.

U.S. Sentencing Memo – 18
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

achieving that goal. *See Gall*, 552 U.S. at 49, 54; *Rita v. United States*, 551 U.S. 338, 354 (2007); *United States v. Osinger*, 753 F.3d 939, 949 (9th Cir. 2014).

Sentencing Starrett to 171 months of imprisonment is commensurate with sentences imposed nationwide on similarly situated defendants convicted of arsons at houses of worship, including:

- *United States v. Penny*, No. 1:23-cr-226 (N.D. Ohio 2024) (defendant pleaded guilty to setting fire to church and was sentenced to 96 months for violating 18 U.S.C. § 247(a)(2), to be served consecutively to 120 months of imprisonment for violating § 844(h)(1), for a total sentence of 216 months of imprisonment).

- *United States v. Proffitt*, No. 20-cr-63 (E.D. Mo. 2023) (defendant pleaded guilty to setting fire to Islamic center and was sentenced to 71 months for violating 18 U.S.C. § 247(a)(1), to be served consecutively to 120 months of imprisonment for violating § 844(h)(1), for a total sentence of 191 months of imprisonment).

- *United States v. Matthews*, No. 19-cr-183 (W.D. La. 2020) (defendant pleaded guilty to committing arsons at three different churches and was sentenced to 180 months of imprisonment for the violations of 18 U.S.C. § 247(a)(1) to be served consecutively to 120 months of imprisonment for violating 18 U.S.C. § 844(h)(1), for a total sentence of 300 months of imprisonment).

- *United States v. Perez*, No. 6:17-cr-35 (S.D. Tex. 2018) (defendant convicted, *inter alia*, of setting fire to a mosque and was sentenced to 174 months of imprisonment for the violation of 18 U.S.C. § 247(a)(1) to be served consecutively to 120 months of imprisonment for violating § 844(h)(1), for a total sentence of 194 months of imprisonment).

- *United States v. Jacques*, No. 3:09-cr-30001 (D. Mass. 2011) (defendant convicted of setting fire to a church and a related civil rights conspiracy and was sentenced to 46 months of imprisonment for the violations of 18 U.S.C. § 241, 247(c) to be served consecutively to 120 months of imprisonment for violating § 844(h)(1), for a total sentence of 166 months of imprisonment).

- *United States v. Grassie*, No. 1:98-cr-00516 (D.N.M. 1999) (defendant was convicted of vandalizing or setting fire to four churches and was sentenced, in pertinent part, to 57 months of imprisonment for the violation of 18 U.S.C. § 247(a)(1) to be served consecutively to 120 months of imprisonment for violating § 844(h)(1), for a total sentence of 177 months of imprisonment).

By contrast, imposing the dramatically below-Guidelines, absolute statutory-minimum sentence recommended by Probation would create the very disparities that 18

U.S. Sentencing Memo – 19
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

U.S.C. § 3553(a)(6) and the Guidelines aim to avoid. Probation recommends the mandatory minimum of 84 months on Count 6. But on each of the four other counts, Probation recommends just one day in custody, concurrent on *all* those counts. That one-day sentence represents a roughly 99.9% downward variance from the bottom of the Guidelines range applicable to those counts.

Nothing in the record justifies Probation's extraordinarily low recommendation. As noted, the only mitigating factor Probation cites to justify a downward variance is Starrett's difficult childhood. PSR ¶ 122. But neither that factor nor any other warrants the extreme downward variance that Probation proposes—the lowest possible sentence allowed by law, with merely one day of imprisonment imposed in total for all four hate-crime counts. A downward variance of the magnitude Probation recommended requires significantly more to support it than Starrett's reports of his difficult childhood. As the en banc Ninth Circuit has emphasized, "'a major departure should be supported by a more significant justification than a minor one' . . . . [T]he greater the variance, the more persuasive the justification will likely be because other values reflected in § 3553(a)—such as, for example, unwarranted disparity—may figure more heavily in the balance." *Carty*, 520 F.3d at 992 (quoting *Gall*, 552 U.S. at 50). Here, the sentence recommended by Probation would be unreasonable based on the totality of the circumstances. *See United States v. Ressam*, 679 F.3d 1069, 1088 (9th Cir. 2012) (en banc). It would contravene the Sentencing Commission's admonition not to give "excessive weight" to "the history and characteristics of the defendant," nor consider them "as a reason for a sentence outside the applicable guideline range." USSG § 5H, Introductory Commentary. And it would ignore the devastating impacts of Starrett's crimes on his victims.

Ultimately, Probation's recommendation neither reflects the seriousness of Starrett's crimes nor provides just punishment for them. A significant downward variance also would not afford adequate deterrence—specific or general—and would signal that terrorizing religious houses of worship does not deserve serious sanction. Moreover, such

U.S. Sentencing Memo – 20
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a sentence would *create* unwarranted disparities rather than avoid them. The purposes enumerated in 18 U.S.C. § 3553(a) would thus not be served by a sentence that deviates so significantly from the Guidelines range. Probation's recommendation should be rejected, as nothing in the record is "sufficiently compelling to support the degree of variance." *Carty*, 520 F.3d at 991 (citation omitted). The government recommends that the Court instead impose a within-Guidelines sentence of 171 months—a sentence sufficient but not greater than necessary to comply with the purposes set out in section 3553(a).

**E.     The recommended sentence provides restitution to the victimized Kingdom Halls**

Finally, the government's recommended sentence considers the need to provide restitution to the victimized Kingdom Halls. 18 U.S.C. § 3553(a)(7). Starrett's attacks caused hundreds of thousands of dollars in damage to these houses of worship and WTNY, the Jehovah's Witness corporate entity. Specifically, the amount of pecuniary loss from these offenses totaled $4,921.73 to the Tumwater Kingdom Hall, $1,749.20 to the Yelm Kingdom Hall, and $707,937.73 to WTNY, for a total of $714,608.70 in restitution. *See* **Exhibit 1** (documentation supporting restitution figures). These figures include the costs to repair the walls, windows, and other areas of the properties that Starrett damaged, to install surveillance and other essential systems, and to rebuild the Olympia Kingdom Hall in its entirety.

As noted above, Starrett agreed as part of his plea to pay full restitution for financial losses caused by his criminal conduct. Plea Agreement ¶ 12. And even apart from Starrett's plea agreement, restitution is mandatory. 18 U.S.C. § 3663A. Accordingly, the government recommends that the Court order Starrett to pay restitution to the affected Kingdom Halls and WTNY in the above amounts under 18 U.S.C. § 3663A. The Court should also order forfeiture consistent with the plea agreement (¶ 13). Starrett has waived any right to appeal the Court's restitution and forfeiture orders. Plea Agreement ¶¶ 12–13, 17.

U.S. Sentencing Memo – 21
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**CONCLUSION**

2

For all these reasons, the Court should sentence Starrett to a total of 171 months in

3

prison (87 months concurrent on Counts 1, 3, 5, and 7, and a consecutive 84 months on the

4

lesser-included offense of Count 6); three years of supervised release on each count, to run

5

concurrently, with the conditions recommended by U.S. Probation; restitution and

6

forfeiture as described above; and, for each count, the $100 mandatory special assessment.

7

       October 11, 2024                 Respectfully submitted,

8

9

                                     TESSA M. GORMAN
                                     United States Attorney

10

                                  *s/ Jonas Lerman*

11

                                  JONAS LERMAN
                                  Assistant United States Attorney

12

                                  United States Attorney's Office
                                  700 Stewart Street, Suite 5220

13

                                  Seattle, Washington 98101-1271
                                  (206) 588-9582

14

                                  jonas.lerman@usdoj.gov

15

                                  KRISTEN M. CLARKE
                                  Assistant Attorney General

16

                                  Civil Rights Division

17

                                  *s/ Matthew Tannenbaum*
                                  MATTHEW TANNENBAUM

18

                                  Trial Attorney
                                  Civil Rights Division, Criminal Section

19

                                  United States Department of Justice
                                  150 M. St. NE

20

                                  Washington, D.C. 20530
                                  (202) 598-5218

21

                                  matthew.tannenbaum@usdoj.gov

22

23

24

25

26

27

U.S. Sentencing Memo – 22
*United States v. Starrett*, CR21-5334-DGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970